Yes, Your Honor. Please proceed. Thank you. Good morning, Your Honors. This case is about Principal's associate person, John Krohn, who was employed with Principal through January of 2017, while associated with the firm defrauded the defendants and over a dozen other persons out of approximately $40 million, soliciting them in investments in companies that he controlled and operated. In late 2014, Mr. Krohn solicited the defendants to invest in Glycerin Group, which later became known as Chemex Global, which is a production facility to produce glycerin and refined cooking oil. Mr. Krohn claimed that Chemex could not pay for the plant and equipment necessary to run the facility, and so he asked Dr. Agarwal to lend the equipment, the plant, the land, and other materials and investments in recognition as debt on the company's balance sheet, as well as an equity, a 25% equity interest in the company. Mr. Krohn also solicited another investor of his, Michael Kemery, to invest in Chemex through a private equity fund that Mr. Krohn ran called Cape Boar. Mr. Kemery is now in a FINRA arbitration with Principal concerning those investments. On August 25, 2016, Mr. Krohn solicited Dr. Agarwal to invest in another company that he was running called Spotlight Innovation. Spotlight is a micro-cap penny stock that's traded on the stock exchange. Mr. Krohn invited Dr. Agarwal to come to his office and drop off a subscription agreement and a check for $250,000 to invest in Spotlight. In December 2016, another $100,000 was invested by Dr. Agarwal into Spotlight, again at Mr. Krohn's suggestion and solicitation. Mr. Weinstein, this is Jed Smith. When did Mr. Krohn's affiliation with Principal end? I believe according to broker check, that is in January of 2017. In total, the Agarwals invested $750,000 in Spotlight through three transactions. One occurred after Mr. Krohn left Principal, and two occurred during his association. The defendants allege that Mr. Krohn abused his position of trust and control at Chemex and Spotlight. What does that have to do with Principal and its oversight of Krohn? Principal is required to understand the nature of its agents outside business activities because those activities are often used as vehicles for advisors to engage in private securities transactions and private fundraising. They're sort of red flag entities. In this case, Mr. Krohn owned a K4, which I referenced as a private equity vehicle. Through K4, Mr. Krohn was able to invest in Chemex, was able to control all these other companies and solicit investors into these schemes. The district court concluded that Krohn was a business partner with your clients and wasn't performing these services in relation to his employment with Principal. What's wrong with the district court's analysis that what's going on here is relations between business partners unrelated to the provision of securities services through Principal? It's that, first of all, we are here to determine whether or not the dispute is arbitrable and not to determine the responsibilities of the underlying parties. The merits of the case are beyond the purview of whether or not the parties agreed to arbitrate. In this case, the defendants are customers of Mr. Krohn because they were induced or shepherded into providing funds and assets into these ventures. The defense that they were business partners does not appear in the code in the arbitration agreement itself. If we were to exclude business partners, we would need to have a justification based upon the contract that requires arbitration. That agreement would have to state that business partners are intended to be excluded from those who can participate in arbitration. But as we see in the cases that defendants have submitted, lawyers, accountants, investment advisors, bankers, and even those who engage in arm's length transactions as described by the Second Circuit in the UBS case can participate and be considered customers and compel arbitration. What was the connection between his work for principal and the claim that you make? The securities laws require firms to prevent violations of the securities laws to supervise those activities. Outside business activities present an attractive vehicle for brokers to defraud investors outside the scope of their employment. Because of that, FINRA requires those businesses and the private securities transaction dealings to be supervised. The rules are 3270 and 3280. They, by definition, apply only to outside activities that are not in the scope of the employment. Those rules specifically target this area because of the potential to defraud the public through outside dealings. The cases that the defendants cite show that this occurs routinely in the industry. Dozens and dozens of cases, five of which have made it to circuit courts across the country, showing that brokers engage in these outside business activities to solicit investors for funds in this manner. So, in this case, the de novo standard of review applies. Principal has argued that the abuse of discretion standard should apply. But this court in Berkel Fisher v. Larman has stated that the de novo standard applies for appeals, for motions to compel arbitration in the FINRA context. In other cases in the circuit, in general, for arbitration. The arbitration clause in this case is FINRA Rule 12-200. That rule states that a customer can compel arbitration if the dispute is between the customer and either the member firm or the associated person of the firm. And that dispute has to arise in connection with the business activity of the member or the associated person. This court in Berkel Fisher v. Larman stated that the FINRA code constitutes an agreement in writing sufficient to compel a party to arbitration. Principal argues that there was no customer relationship at the time of the bad acts between Dr. Agarwal and Principal. Why are they wrong? They are wrong because the ChemEx deal began in December of 2014 with an agreement between Mr. Krohn, Dr. Agarwal through TechnoChem and two other parties to invest in ChemEx. The next investment was made in 2016. Again, this period is while Mr. Krohn is associated with Principal. And during this time, TechnoChem is lending to ChemEx and the investments are being made in Spotlight. And so this occurs during the period of association. There are, of course, dealings that occur beyond the period of association, but it's not pertinent to this dispute because it's clear that funds, deals are being negotiated, transactions made, office visits. All the indicia of investment advice is being rendered during the period of association with Principal. And so the fact that, you know, at that point, much of this is going on, that Mr. Krohn's been offered the position as the chief financial officer and paying $25,000 does not make him a business associate or partner of Dr. Agarwal such that liability cannot lie? Defendants claim that Mr. Krohn actually controlled the business and the finances of ChemEx well before that letter, that he was the one who obtained the loans from various two banks before that period. That letter is kind of a pretext because I believe it provides Mr. Krohn with plausible deniability. That is, if you were caught by Principal engaging in this activity without disclosure, he would tell Principal, well, I invested through K4 and I disclosed to you that I have K4. I didn't disclose ChemEx because I did not invest and I am not an officer of ChemEx and I did not believe that I had to disclose it to Principal. So I believe that that letter is part of the pretext of his plausible deniability and involvement. But again, the fact that it flows through K4 doesn't mean that he acted as manager of the company and had control of the finances. It doesn't obviate the obvious nature that he was engaging in undisclosed outside business activity for which he was later sanctioned for. Mr. Weinstein, what definition of the term customer should we use in the analysis of this case? I like the definitions provided in the Rovin and the Triad cases. In the Rovin case, a customer is described as one who is induced or shepherded by the advisor to participate in the transaction. Triad uses terms of provided services or facilitated the transaction, putting the people together necessary for the relationship to come about. I mean, I would go further. In this case, you could apply a but-for causation test. If Mr. Crone doesn't exist, there could not possibly be an investment in Spotlight or ChemEx. Mr. Crone, he's not serving as the middleman between defendants and the sponsor of an investment. He is both the middleman and the manager of that investment. And so he's an indispensable party. You're in your rebuttal time. You can continue if you like, or you can reserve. I'd like to reserve. All right. Ms. Eldridge. May it please the court. The order of the district court was correct and should be affirmed. A simple principle governs this case. A party that has not agreed to arbitrate a dispute cannot be required to do so. The critical factors at issue in this case is that these defendants, Dr. and Mrs. Agarwal and Technochem, never at any time believed they were dealing with PSI. They never at any time believed they were dealing with Mr. Crone in his capacity as a registered representative of PSI. And that's why their demand for arbitration fails. They did not consider themselves customers of Mr. Crone or PSI. Where do you cite in the record for that statement? Yes, Your Honor, if you look at the order found by the district court, the district court expressly noted that the defendants do not allege that their interactions with Mr. Crone were driven by their belief that Crone was advising them under PSI's banner. And that's at the appendix at 248. Would it would it be enough that they were customers of Mr. Crone who could be considered an associated person of PSI? If they were customers in the context of being a business relationship that is related directly to investment or brokerage services, which in this case they were not, and there is no evidence in the record that would support such a finding. Well, I'll ask you the same question I asked the other side. What definition of customer should the court use in evaluating this case? The court should continue to use the definition of customer that it previously set forward. That is a business relationship that is related directly to investment or brokerage services. And that was in Fleet Boston at 772 related directly to investment or brokerage services is the clear requirement there. And there are two claims at issue in this case. The first is a nine million dollar claim relating to Chemex. The defendant's allegations with respect to that transaction make the nature of that relationship crystal clear. And it's crystal clear that is not a customer relationship. They allege that in late 2014, Mr. Crone knew and worked with a friend of his, Mark Merritt, to develop a business plan for a company that would operate a grocery and refining plant. Building such a plant would take both funding and expertise, which the two lacked. Mr. Crone and Mr. Merritt brought Dr. Agarwal and Mrs. Agarwal and their company Technochem into the Chemex deal in order to provide the expertise, property, machinery and labor necessary to construct and run the plant, which Mr. Crone and Mr. Merritt could not afford to pay for by their own admission in their very own statement of claim allegations. This is a business venture, not investment or brokerage services. That's the first claim. There is also a second claim, which is the purported transaction of the investment in Spotlight. But the evidence in the record is insufficient to establish that there were any services provided in connection with that. There is no evidence in the record sufficient to establish that there is a relationship there. In fact, the evidence submitted was not even competent evidence, and there was no evidence of any compensation being paid for any purported transaction or services. So, again, both of these claims fail because they do not establish that they're customers and they do not establish that they're business activities that arise out of PSI's business of the investment or brokerage business. As a result, PSI moved to enjoin and the district court properly enjoined those claims. I have a question on that point. What is PSI's cause of action? In the underlying district court, the cause of action, PSI filed a motion to enjoin. I know they filed a motion to enjoin, but what is their cause of action? I mean, the Federal Arbitration Act creates a cause of action to compel an arbitration. But what's the cause of action for a federal court to enjoin a private arbitration? And I think it's based on the fact that there is obviously the black letter law from the Supreme Court that a party that has not agreed to arbitrate cannot be compelled to arbitrate those claims. And obviously, there's jurisdiction here because in the underlying action, they allege federal securities claims. And then an injunction is a proper method to oppose the arbitration and have it set aside, as has been handled by other courts because of the issues of irreparable harm that come up in connection with being required to arbitrate a claim that would otherwise not be subject to arbitration. Well, this may not have come up in the district court or in the briefs, but I did have a question because I just wonder whether there's a cause of action for what you're essentially saying is wrongful arbitration and whether that's a cause of action on which a party can sue or whether you really just have to deal with that in the arbitration forum. And if somebody tries to enforce an arbitral award, deal with it at that time. I know this hasn't been brief, so I'm probably catching you off guard with it, but I wondered if anybody thought about it. If you don't have an answer right off the top of your head, I understand. And maybe it's been waived by the other side, but it was a question I had, so I thought I would see if you had anything in mind. But if you don't, feel free to go back to your points on... And I guess I would suggest that the court has previously found that you can enjoin improperly raised arbitration and the court is the appropriate forum to resolve that issue because there is no agreement to arbitrate. And so there has to be a means to resolve that, and the courts have been found to be that forum because that's not an issue that has been agreed to be arbitrated. In ruling on the request for injunction that PSI brought before the district court, the district court properly relied on this court's decision and data phase for the factors at issue there. Success on the merits, threat of irreparable harm, balance of harms as between the two parties, and the public interest. Importantly, as this court knows, no single factor is dispositive and all of those factors must be weighed and balanced. The district court found that PSI met all of those factors. And importantly, at issue here today, the defendants do not take issue with three of those four factors. Only one factor, success on the merits, is at issue here. In the court's order, the court noted that there was no written agreement to arbitrate between the parties. The court looked at Federal Rule 12-200 to determine if under that rule, PSI was required to arbitrate the claims and looked at whether the defendants were customers and the dispute arose in connection with the business activities of a member or associated person of the member. The court's express findings were that there is no showing that defendants were PSI customers. They found that defendants were Crohn's business partners and they found that the activity was entirely outside of his former capacity as a registered representative and that it was involved in business ventures, not securities transactions. Importantly, the district court also noted defendants do not allege that their interactions with Crohn were driven by their belief that Crohn was advising them under PSI's banner. And those are critical findings that this court must give deference unless they are clearly erroneous, which they are not. Looking at the underlying factors for the success on the merits, looking at whether both prongs of Federal Rule 12-200 were satisfied, were these individuals customers such that they can demand arbitration and does their claim arise out of the business activities of PSI? The court started with looking at the customer prong and whether they are customers. As this court noted in Fleet Boston, the definition of customer refers to one involved in a business relationship with an NASD member that is related directly to investment or brokerage services. The district court found that defendants did not allege or prove that their interactions with Mr. Crohn were driven by any belief that they were being advised under PSI's banner. They instead allege what can only be construed as a business relationship and based on the evidence in the record, the district court was entirely inappropriate in finding so. This is Jed Smith. Could Crohn's interaction with the plaintiffs or with the Agarwals to participate in ChemEx be construed to be a type of investment? Crohn's relationship with them could not be construed to be a relationship that had anything to do with an investment. They were business partners that had joint business dealings. They went into this. They executed a letter of intent where they shared in the ownership of this business and Dr. Agarwal himself was CEO and president of the company so that he received equity interest in payment for his role as CEO and president. That takes this out of the context of being some sort of customer relationship where there's an investment. There's absolutely zero record evidence or even allegations that with respect to the ChemEx transaction, Mr. Crohn was providing investment services. He was providing investment advice, making investment recommendations to them. They were in no way relying on him in making an investment decision or a decision to invest. What they were doing instead was joining in with a group of people. It wasn't just Mr. Crohn and it wasn't just the Agarwals and their company Technocam, but instead it was a group of individuals who came together to undertake this business operation to build a glycerin refining plant. I mean, that is so far afield from anything that could be considered remotely related to the business activities of a member broker dealer like PSI. It clearly is far afield from anything like that. The fact is these people and the record evidence shows were not people using Mr. Crohn for investment advice and guidance with respect to the ChemEx transaction or the Spotlight transaction. And there would be no evidence in the record to support such a finding. Thus, the district court's finding was not erroneous and, in fact, was in line with what was available in the record. And that was after the defendants were given full opportunity to undertake discovery relating to this issue and present that evidence during a hearing with the court. That they waived that and elected not to do so does not make the district court's findings any less important. And they are thus still due that deferential standard that is appropriate here. And the record is replete with evidence of that business relationship as the court found. Looking at the issue of business activities and whether their claims arise in connection with the business of the member or the associated persons. Again, the defendants did not allege or offer evidence that they relied on Mr. Crohn's association with PSI or believe they had a relationship with PSI or that the activities were the business activities of PSIs or related in any way to a broker dealer member firm. And this is where the question of intent that some of the cases addresses comes in and really should be part of the consideration here. Is this a claim that would fall within the reasonable expectations of the FINRA member firm in agreeing to the provisions of Rule 12-200 with FINRA? Is this within the reasonable expectations that they would be required to arbitrate these claims? These claims that primarily involve issues relating to business dealings of two companies, Technochem and Chemex, that have completely nothing to do with them or with their business. Counsel, what, if anything, is to be made of the visits to the PSI offices to see Mr. Crohn and the signature of some documents? And what was there with that and what was the connection between those visits and PSI? Short answer is nothing. Nothing is to be made of those because it was simply insufficient to establish a relationship, to establish that there were services being provided, that they may have gone by an office to drop something off, in no way changes that they did not believe this had anything to do with PSI. And there's really little to no evidence in the record that even supports that contention. But even if you take what is in the record, nothing in it shows recommendations or solicitations. What we see instead are communications from a Gmail account that include no recommendation or solicitation or even advice of any kind. There's simply insufficient evidence in the record to show that that rose to the level of creating a relationship, that it rose to the level of providing investment or brokerage services, which are the touchstones of this court's rulings on prior cases involving these issues. And if the activities are unrelated to the associated person's relationship with the FINRA member, they are outside the business activities as set forth in Rule 12. What the defendants are urging here is that this court adopt an interpretation that any business activity would constitute business activity sufficient for Rule 12-200. That suggestion and that interpretation. You've exhausted your argument time. Thank you. Mr. Weinstein, your rebuttal. Thank you. The principle brings up a whole bunch of facts that are irrelevant. Capacity, knowledge, all these are defenses to the failure to supervise claim. The issue is whether or not supervision is a business activity of the member, which it is. And that dispute is resolved by the arbitrator to determine what the capacity is, who is responsible for this activity. The Supreme Court has said numerous times that even frivolous cases must be arbitrated. For example, in the John Hancock case of the Second Circuit on this issue, the investor had no idea that the broker was associated with John Hancock. The same facts apply. Knowledge is irrelevant. But in this case, certainly the Agawals knew that Mr. Crone was associated with principal. They went to his office. It was part of his bio. It's in the letter that we went over earlier. Another that apparently principal claims that this this case is replete with evidence. But in fact, they continue to falsely claim that Dr. Agawals, the CEO and president of Chemex, when there's no evidence to support this and it's completely false. And they continue to repeat it without any evidentiary foundation whatsoever. In their in their briefs, they cite J.A. the appendix 100 for a letter where Dr. Agawals says that he's the president of Techno Chem, the defendant in this case, and then misconstrued that to be the defendant of the entity that Techno Chem invested in. So, again, there isn't replete evidence for any of the claims, which brings us to the what we heard about the evidentiary burden. We're in a preliminary injunction. And the and the plaintiff is saying that the defendant bears the burden in a preliminary injunction. But they didn't come forward with competent evidence that that there's no evidence. And that simply principal denying the claims is sufficient in a preliminary injunction. That tells you that, in fact, data based standards were not followed in this case. And there are numerous cases on FINRA arbitration that state that it is the brokerage firm that has the obligation to come forward with conclusive proof that the investor was not a customer. The Horner, the Oppenheimer, the Nieder case out of the Second Circuit makes that statement as well. The Hamilton, the Horner-Townsend-Hamilton and First Alley cases. And that standard has not been met. And principal continues to try to shift the burden and then make up facts about being CEO that are not true. Thank you, Mr. Weinstein. I see no additional questions from my colleagues. The court wishes to thank both counsel for your presence and the arguments you've provided to the court this morning. And we will continue to study the briefing that you've submitted and will render a decision in due course. Thank you.